**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |
|---|---|
| RANDOLPH CARSON, | : |
|  | :    Civil Action No. 17-6537(RMB) |
| Petitioner | : |
|  | : |
| v. | :      **OPINION** |
|  | : |
| NEW JERSEY STATE PRISON, | : |
| *et al.,* | : |
|  | : |
| Respondents | : |
|  | : |

**BUMB**, District Judge

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Pet., ECF No. 1) filed by Petitioner Randolph Carson ("Petitioner"), an inmate confined in New Jersey State Prison in Trenton, New Jersey. Respondents filed an answer opposing habeas relief. (Answer, ECF No. 10). Pursuant to Federal Rule of Civil Procedure 78, the Court will determine the claims presented in the petition on the written submissions of the parties.

I.    PROCEDURAL HISTORY

In May 2000, Petitioner was indicted on two counts of aggravated sexual assault, two counts of endangering the welfare of a child, one count of aggravated sexual contact, and one count of sexual assault in the Superior Court of New Jersey, Law

Division, Atlantic County. (Indictment, ECF No. 8-2.) Petitioner was subsequently tried four times before the Honorable Albert J. Garofolo, J.S.C. and a jury. (App. Div. Op., ECF No. 8-19 at 3.) Petitioner's first trial ended in a hung jury. (Id.) Petitioner was convicted following his second trial, but the New Jersey Appellate Division reversed the conviction after determining the trial court had improperly excluded evidence relevant to the defense. (Id.) Petitioner's subsequent third trial again resulted in a hung jury. (Id.) Prior to his fourth trial, Petitioner filed a motion to dismiss the indictment and to bar another retrial based upon fundamental fairness grounds. (Tr. of Motion to Dismiss, ECF No. 8-3.) The trial court denied Petitioner's motion. (Trial Ct. Order Denying Motion to Dismiss, ECF No. 8-4.) Petitioner appealed and on June 3, 2009, the Appellate Division affirmed the trial court's decision. (App. Div. Op. Affirming Denial of Motion to Dismiss, ECF No. 8-6.) Following his fourth jury trial in 2009, Petitioner was convicted of all six counts in the indictment. (App. Div. Op., ECF No. 8-19 at 3.) Petitioner was sentenced to an aggregate term of thirty-four years imprisonment. (Judgment of Conviction, ECF No. 8-15.)

The Appellate Division affirmed Petitioner's conviction and sentence on February 14, 2013. (App. Div. Op., ECF No. 8-19.) The New Jersey Supreme Court denied Petitioner's request for certification. (Sup. Ct. Order, ECF No. 8-23.)

In October 2013, Petitioner filed a Verified Petition for Post-Conviction Relief ("PCR") in the Superior Court of New Jersey, Law Division, Atlantic County. (PCR Pet., ECF Nos. 8-24, 8-25.) On September 19, 2014, oral arguments were held before Judge Garofolo. (Tr. of PCR, ECF No. 8-14.) In a written decision dated January 16, 2015, the PCR court denied Petitioner's PCR. (Trial Ct. Op. Denying PCR, ECF No. 8-28.) On January 12, 2017, the Appellate Division affirmed the PCR court's decision. (PCR App. Div. Op., ECF No. 8-33.) Petitioner filed a petition for certification in the New Jersey Supreme Court, which was denied on May 2, 2017. (Sup. Ct. Order, ECF No. 8-37.) In August 2017, Petitioner filed the instant habeas petition. (Pet., ECF No. 1.)

II.  BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal. See State v. R.J.C., No. A-0285-10T2, 2013 WL 532318 (N.J. Super. Ct. App. Div. Feb. 14, 2013).

> This was the most pertinent evidence presented at the 2009 trial. The alleged assaults occurred while defendant's step-children, W.E. and S.E., were living with defendant and the children's biological mother, M.D. By the time of the 2009 trial, W.E. was twenty-two years old. W.E. testified that when she was nine, she and her sister moved out of their grandmother's home, where W.E. had lived all her life, and began living with M.D. and defendant. For about a year, W.E. slept in M.D.'s and defendant's bed, because she was used to sharing a bed when she lived in the

3

grandmother's crowded home, and she felt more comfortable sleeping with someone else. W.E. also spent a lot of time with defendant, because her mother worked at night.

W.E. described in considerable detail how defendant began molesting her, first by touching her genital area over her clothing, and later by forcing her to have intercourse with him. On occasion, he also penetrated her with a finger and forced her to have oral sex with him. According to W.E., although she was in pain and sometimes bleeding, she did not tell anyone because she was ashamed and embarrassed. She was also afraid that if anyone found out, she and her sister would be taken from their mother's custody and she would "lose [her] mother."

The molestation continued for about a year, until she stopped sleeping with her mother and defendant. W.E. testified that she did not tell anyone about the molestation until she was in sixth grade, when she told her best friend, L.R. Later, after she overheard her sister, S.E., telling another friend that defendant had raped her, W.E. told S.E. that defendant had victimized her too. Both girls confronted defendant with what he had done to them. According to W.E., defendant said "how sorry he was, and how he would never hurt us again, and ... you always hurt the ones you love."

On another occasion, when the girls told defendant that they were going to tell their mother what had happened, defendant became angry and threatened that if they did so, it would be reported in the newspapers, and everyone, including all their friends, would find out about it. W.E. was intimidated by his threats. She did not tell the police about the molestation until she was fourteen years old.

The other sister, S.E., was twenty-five years old at the time of the 2009 trial. She also gave graphic testimony about the ways in which

defendant sexually molested her, after she and
W.E. moved in with their mother and defendant.
At the time of the move, in 1996, S.E. was
twelve years old. In 1997, when she was
thirteen and going through puberty, defendant
started grabbing her breasts and making
inappropriate comments about her body. In one
incident, he started taking her clothes off,
purportedly to show her how beautiful her body
was. He also forced her to let him take
pictures of her, naked from the waist down,
claiming that he wanted to document whether
her hymen was still intact. He then forced her
to touch his penis and "masturbate him," by
threatening to "post [the pictures] in the
barbershop" if she refused. Defendant also
took a video of S.E. with her shirt off and
showed her naked photographs of himself. The
video and the photos were introduced in
evidence.

S.E. described, in detail, several later
incidents in which defendant raped her and
forced her to engage in oral sex. Defendant
threatened her that if she told anyone, they
would "both be in trouble" and she "would have
to move back to [her] grandmother's." She was
afraid to tell anyone what he had done.
However, at some point, S.E. told a close
friend, V.E., and later, in the fall of 1999,
she told an adult, A.A., who worked at the
high school she attended.

M.D. testified that in 1996, she and defendant
bought a house together so that she could "get
the kids back" from their paternal
grandmother's home. She confirmed that W.E.
used to sleep with her and defendant, and that
defendant cared for the children while she
worked the night shift at a casino. In
December 1999, S.E. told M.D. that defendant
"had been molesting her." According to M.D.,
she did not learn that W.E. had also been
"involved" until after the police came to the
house to investigate. After defendant was
arrested, he called M.D. repeatedly to say
"[t]hat he was sorry that he hurt me and that

he hurt our family, and that he was sick and
he needed help."

M.D. also testified that after his arrest,
defendant asked her to look in the house for
a metal box that he told her contained savings
bonds. In the summer of 2001, she found a
locked box in the garage. Her son broke the
lock, in her presence, and in the box they
found "[s]exually explicit" photographs. She
gave the photos to the police.

On cross-examination, M.D. admitted that she
did not immediately go to the police when S.E.
told her that defendant was molesting her.
Instead, she tried to contact A.A. at the high
school. M.D. testified that she "didn't know
what to do." Meanwhile, she continued to let
defendant stay home alone with the children.
She testified that at one point she briefly
considered leaving defendant, and packed her
bags. However, he took her car keys to prevent
her from leaving, and she abandoned that plan.
M.D. also testified on cross-examination that
she never had any genital warts.

The State presented testimony from Dr. Deborah
Lowen, an expert in child abuse pediatrics.
Dr. Lowen examined both S.E. and W.E. in March
2000, "[t]o evaluate and treat any possible
problems as a result of possible sexual
abuse." Dr. Lowen testified briefly that when
she took S.E.'s medical history, the history
included "allegations ... of sexual
penetration." In examining S.E., Dr. Lowen
found a partial tear to the hymen, which had
healed, evidencing "penetrating vaginal
trauma." However, the doctor could not
determine "who caused it or when it occurred,"
because S.E. told her that she "had had
consensual sexual intercourse in addition to
abusive sexual intercourse."

Dr. Lowen also found a genital wart near
S.E.'s hymen. She explained that genital warts
are caused by various types of human papilloma
virus (HPV), and the virus is commonly

transmitted through sexual contact. She
testified that condoms do not always prevent
transmission, and a person infected with the
virus would not always have "visible warts."
She explained that warts can also "come and
go" over time. Therefore, if a woman has a
visible genital wart, "but her male sexual
partner does not have a visible wart," that
would not exclude him as the source of the
woman's infection. Nor would the absence of
visible genital warts in the man's other
sexual partners exclude him as the source. Dr.
Lowen explained that "people with visible
warts are basically the tip of the iceberg
[among] all the people who have HPV."

Dr. Lowen also examined W.E. and found that
she had a healed tear of the hymen. However,
she could not opine as to who caused that tear
or when it occurred. On cross-examination, Dr.
Lowen agreed that she could not tell from the
physical examination whether either S.E. or
W.E. had been sexually abused, but she
explained that "the exam is not for the
purpose of proving whether a child has been
sexually abused." She also agreed that HPV was
highly contagious, but insisted that the
absence of a wart did not mean that a person
was "negative for HPV."

At defense counsel's request, immediately
after Dr. Lowen's testimony, the trial judge
gave the jury a lengthy limiting instruction.
Among other things, he told the jurors that
they could only consider Dr. Lowen's testimony
concerning "what she saw physically when she
examined" the girls and "the possible
inferences that could be drawn from what she
saw physically." He strongly cautioned them
that "[a]ny opinion she may have ... that the
children were in fact sexually abused must be
disregarded by you." There was no objection to
the wording of the limiting instruction.

The State also presented brief fresh complaint
testimony from the victims' friends, L.R. and
V.E. In the final jury charge, the judge gave

a very extensive instruction concerning the limited purpose for which the jury could consider that testimony.

The defense presented testimony from two of defendant's long-time friends, concerning his good reputation in the community. The defense also presented testimony from Dr. John Scalera, a urologist, who examined defendant on May 12, 2000 to determine "if he had any genital warts or genital diseases." He found no genital warts. On cross-examination, Dr. Scalera agreed that the fact that defendant did not have genital warts on the day he examined him did not mean that "defendant never had any warts." He also agreed that a physical examination would not reveal whether defendant "ever had any genital warts."

The defense next presented testimony from Jacqueline Kiernan, an employee of the Division of Youth and Family Services (Division). Kiernan conducted an investigation in 2000, after A.A. reported S.E.'s allegations to the Division. Kiernan met with S.E., who told her that her step-father had sexually abused her, starting three years previously and ending two years before the interview. However, S.E. also told Kiernan that, the weekend before the interview, defendant called her into his bedroom; on entering, she saw defendant with his penis exposed, watching pornography on the internet. S.E. recounted that she "told [defendant] to put it back in his pants and left the room."

S.E. also told Kiernan that defendant stopped molesting her after she "mouthed off at him," and that she and her sister were "just stick[ing] together" in opposing defendant's efforts to molest them. S.E. informed Kiernan that after she spoke to A.A., she also told her mother that defendant molested her, but did not tell her mother what had happened to W.E. After speaking with S.E., Kiernan interviewed W.E. and arranged for Dr. Lowen to examine both girls.

In an effort to show that S.E.'s and W.E.'s trial testimony was different or more extensive than their original statements to the police, the defense read to the jury the testimony of Detective Oglesby, who interviewed the girls in 2000. He confirmed that during their interviews, neither S.E. nor W.E. mentioned that defendant forced them to have oral sex with him, although they revealed many other sexual activities that he forced upon them.

The defense also called A.A. as a witness. While he was a social work student in college, he participated as a counselor in a recreational program at S.E.'s school. When S.E. applied to participate in the program, she indicated, in response to a question on the application form, that she had been physically and sexually abused. A.A. testified that he followed up on that application by interviewing her on October 14, 1999. At that time, S.E. told him that her grandmother's boyfriend had sexually abused her. At the next meeting, she told him that her brother had argued with her about "some rumors" going around about her. She mentioned that her mother "was trying to move out because her stepdad had a bad temper," but later indicated that the situation "did get better."

A.A. testified that after five meetings, S.E. finally told him on, November 16, 1999, that her step-father had sexually abused her when she was twelve years old. She told A.A. that the abuse occurred "after [defendant] gained her trust about the previous incident with sexual abuse by her grandmother's paramour." A.A. discussed these disclosures with a supervisor and urged S.E. to tell her mother about the situation. On cross-examination, A.A. testified that S.E. disclosed to him that her step-father had sexual intercourse with her, as well as oral sex. She told him the molestation had been going on since she was twelve years old. She also revealed that the

step-father had molested her sister. A.A. confirmed that he called the Division to report the allegations. When the Division contacted S.E. to interview her, she told A.A. that she was embarrassed and afraid that her fellow students would find out what happened to her.

In his trial testimony, defendant denied that he ever molested or inappropriately touched S.E. or W.E. He admitted taking the video of S.E., but insisted that it was only one of many videos he took of the children in order to keep M.D. aware of what was happening with the children while she was at work. He also authenticated a video that he made of S.E., consisting of his interviewing her about her prior experience being molested at her grandmother's house. During that video, defendant told S.E. that if anything bad happened to her she should tell her mother about it.

Defendant confirmed that when the children first moved in with him and M.D., W.E. sometimes slept in their bed with them, and would sometimes remain in bed with him after M.D. left for work. However, he denied having any sexual activity of any kind with W.E. He also denied telling the girls not to tell anyone if something bad happened to them. He insisted, to the contrary, that he "encouraged" them to tell someone if bad things happened to them. Defendant denied that he ever had venereal warts and stated that he had no knowledge of M.D. ever having them.

According to defendant, even after M.D. was aware of the allegations that he molested the girls, she continued to have sexual relations with him. He later told M.D. that he thought it was "disgusting" that she heard about those allegations "and she continued having a sexual relationship with me." Defendant testified that he was the main disciplinarian in the household, and he was quite strict. The girls

resented this and sometimes said they hated him.

Defendant denied ever exposing himself to the girls or taking nude pictures of them. He admitted taking nude pictures of a former paramour, but insisted that he kept those pictures locked in a box and never showed them to S.E. He denied ever asking M.D. to retrieve the box. He admitted briefly touching S.E.'s breast once, at her request, because she told him there was a lump in her breast. The lump turned out to be a cyst, which she had removed.

According to defendant, at some point, his relationship with M.D. started to deteriorate. He told M.D. that he was thinking of breaking up with her, and took steps to put the house on the market. This brief testimony was designed to support the defense theory that the girls made up the sexual abuse allegations, with M.D.'s encouragement, in order to retain possession of the house and force defendant to move out.

On cross-examination, defendant was questioned extensively about the video he made of his "interview" with S.E., around the time that the girls were moving into his house. In the video, he elicited from the child her disclosure that while at her grandmother's house, a man tried to put his tongue in her mouth and was improperly touching her. In response to the prosecutor's questions, he admitted that instead of immediately stopping the videotaping and calling M.D., he went on with the interview; however, he stated that he later told M.D. and suggested that she watch the video.

He also admitted that after eliciting S.E.'s disclosure about the prior molestation, he told her in great detail about all the sacrifices he and M.D. were making to buy the house and what a financial burden it was, in order to make sure that S.E. appreciated what he and M.D. had done for her. At one point in

the video, he joked with S.E. that she and her
sister might have to go back and live with
their grandmother, although he knew she hated
living there. Defendant also admitted taking
a video of S.E. in which she was undressing,
but he asserted that he did not realize that
she was going to take her dress off during the
video. He admitted that the pictures in the
locked box included him as well as his former
paramour and were "pornographic." But he
denied ever showing them to S.E.

Id. at *1-6.

III. DISCUSSION

    A.    Standard of Review

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claim that was adjudicated
> on the merits in State court proceedings[1]
> unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as

---

[1] "[A] claim has been adjudicated on the merits in State court
proceedings when a state court has made a decision that finally
resolves the claim based on its substance, not on a procedural, or
other, ground." Lewis v. Horn, 581 F.3d 92, 100 (3d Cir. 2009)
(quoting Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009)).
"Section 2254(d) applies even where there has been a summary
denial." Pinholster, 563 U.S. at 187. "In these circumstances,
[petitioner] can satisfy the 'unreasonable application' prong of
§ 2254(d)(1) only by showing that 'there was no reasonable basis'
for the [state court's] decision." Id. (quoting Harrington v.
Richter, 562 U.S. 86, 98 (2011); see also Johnson v. Williams, 568
U.S. 289, 301 (2013) ("When a state court rejects a federal claim
without expressly addressing that claim, a federal habeas court
must presume that the federal claim was adjudicated on the merits
– but that presumption can in some limited circumstances be
rebutted.").

> determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts
> in light of the evidence presented in the
> State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. Williams, 529 U.S. at 412. An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S.Ct. 1855, 1862 (2010)).

B.  Analysis

1.  Ineffective Assistance of Counsel

In Petitioner's first ground for relief, he raises several ineffective assistance of counsel claims against his trial counsel. (Pet., ECF No. 1 at 6.) Specifically, Petitioner states the following:

1. Trial counsel failed to protect my due process rights not objecting to the reading of prior testimony of Det. Charles Oglesby to the jury without him present – without my agreeing to it.

2. Counsel failed to investigate, refused to send investigator to speak with valued witness – says 8 yrs ago witness was hostile.

3. Counsel failed to protect my right Double Jeopardy (4 trials, Double Jeopardy attached somewhere).

4. Counsel failed to call witnesses and being diligent in interviewing them for trial.

5. Counsel did not put forth a strategy for trial or proper presentation, states to judge that she has no strategy.

6. Counsel failed to object to nude photos being admitted when during a prior hearing was inadmissible. Counsel condoned perjured testimony.

(Id.)

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 687–88 (1984). There are two elements to a Sixth Amendment ineffective assistance of counsel claim, deficient performance by counsel and prejudice. See Premo v. Moore, 562 U.S. 115, 121 (2011). For the deficient performance prong, "a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. at 121 (internal quotations omitted) (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)). A petitioner must overcome a "'strong

presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Id. (quoting Harrington, 562 U.S. at 104). The burden a petitioner must meet is "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 121–22. (quoting Harrington, 562 U.S. at 104). Habeas review of counsel's performance is doubly deferential, and the question is not whether counsel's actions were reasonable but whether there is any reasonable argument that counsel satisfied Strickland's deferential standard. See id. at 122–23.

To prove Strickland prejudice, a petitioner must establish that "counsel's errors were so serious as to deprive the defendant of a fair trial." Strickland, 466 U.S. at 669. To establish prejudice, a petitioner must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission." Hinton v. Alabama, 571 U.S. 236, 264 (2014). On habeas review, it is not enough that a federal judge would have found counsel ineffective. See Harrington, 562 U.S. at 101. The judge must find that the state court's resolution of the issue was unreasonable. See id.

### a. Failure to Object to the Reading of Detective Oglesby's Testimony

Petitioner first alleges that his trial counsel was ineffective for not objecting to the reading of Detective Oglesby's

prior testimony into the record. (Pet., ECF No. 1 at 6.) Petitioner states that trial counsel failed to protect his due process rights by having the testimony read in lieu of Detective Oglesby's live testimony. (Id.) Respondents contend that Petitioner's claim is a "*non sequitur*, as not only was Det. Oglesby a defense witness, but it was defense counsel who proposed reading his testimony." (Answer, ECF No. 8 at 13.)

When Petitioner raised this claim during his PCR proceedings[2], the PCR court held, in pertinent part:

> Defendant's claim that counsel was constitutionally incompetent for failing to discredit the testimony of his *own witness* is meritless.
>
> There is no half-cogent reason as to why [Petitioner's trial attorney] should have attempted to impeach or otherwise dispute the credibility of a witness whose testimony—if viewed as true—*helps to exonerate Defendant*. At best, her decision was a prudent strategic decision to keep Defendant *out* of jail. The reasoning behind Defendant's argument is difficult to ascertain, much less comprehend.
>
> Additionally, even if [Petitioner's attorney's] failure to impeach Detective Oglesby constitutes incompetence, there is

---

[2] This Court notes that the claim Petitioner raised on PCR was framed differently than the claim he raised in the instant habeas petition. Before the PCR court, Petitioner argued that trial counsel was ineffective for reading Detective Oglesby's testimony to the jury, and that trial counsel was ineffective for not informing the jury that Detective Oglesby was currently facing criminal charges. (Answer, ECF No. 8, Ex. Ra24, ECF No. 8-25 at 10-13.) In his § 2254 action, Petitioner argues his trial counsel was ineffective for not objecting to the reading of Detective Oglesby's prior testimony. (Pet., ECF No. 1 at 6.)

absolutely no evidence that such a failure
would have made any different in the outcome
of the case. Indeed, had Defendant gotten his
way and discredited Detective Oglesby's
testimony, he would have likely made it that
much easier for the jury to return a guilty
verdict.

(Answer, ECF No. 8, Ex. Ra27, ECF No. 8-28 at 2-3 (emphasis in
original).)

On appeal, the Appellate Division affirmed the decision of
the PCR court, stating that Petitioner had presented no more than
"bald assertions." See State v. R.J.C., No. A-3619-14T4, 2017 WL
117297, at *1 (N.J. Super. Ct. App. Div. Jan. 12, 2017).

Detective Oglesby had been a defense witness and testified on
behalf of Petitioner during Petitioner's first three trials. See
R.J.C., 2013 WL 532318, at *5. Detective Oglesby's testimony was
presented by the defense to undermine the credibility of the
victims by identifying inconsistencies in their initial statements
to police and their testimony at trial. See id. At Petitioner's
fourth trial, defense counsel was unable to locate the detective.
(Trial Tr. dated 9/16/09, ECF No. 8-10 at 3.) Given Detective
Oglesby's absence, defense counsel requested that his prior trial
testimony be read into the record. (Id.) The State agreed to
stipulate to the reading of Detective Oglesby's testimony. (Id.)

Here, Petitioner cannot demonstrate that his trial counsel
was ineffective for having the testimony of Detective Oglesby read
at trial because he cannot demonstrate that he was prejudiced by

the admission. Despite trial counsel's good faith attempts to find Detective Oglesby, she was unable to locate him, and he was not present to testify at trial. If defense counsel had not requested that Detective Oglesby's testimony be read into the record, the jury would not have heard his testimony that undermined the credibility of the victims and was favorable to Petitioner's defense. Moreover, Petitioner has not demonstrated what, if anything, the jury would have gained from listening to Detective Oglesby's testimony live rather than hearing it read. See R.R. v. Beard, Civ. No. 09-1102, 2015 WL 5730784, at *4 (W.D. Pa. Sept. 30, 2015) (denying petitioner's argument that he was prejudiced by his witness' testimony being read into the record in lieu of his live testimony because there was not a reasonable probability that the outcome of the trial would have been different if the witness had testified live.) Accordingly, Petitioner is not entitled to relief on this claim.

> b. Trial Counsel's Failure to Investigate and Call Witnesses for Trial

Petitioner next argues his trial counsel was ineffective for failing to investigate several witnesses. (Pet., ECF No. 1 at 6.) Petitioner states that counsel failed to call witnesses and refused to send an investigator to speak with these valued witnesses. (Id.) Respondents argue that Petitioner's claim is without merit because he fails to name any individuals who defense counsel should have

investigated and he fails to proffer what these witnesses, if questioned, would have testified about. (Answer, ECF No. 8 at 13-14.) To the extent Petitioner intends to identify the same witnesses he discussed in his pro se PCR brief, Respondents assert that Petitioner has still not proffered what the witnesses would have testified about. (Id.)

When Petitioner first raised this claim during his PCR proceedings, he named several witnesses he alleged had been "willing and able to testify" on his behalf at trial. (Petitioner's pro se PCR Br., ECF No. 8-25 at 47.) Except for one witness, Petitioner did not provide what these individuals would have testified about. (Id.) Petitioner's failure to provide sworn testimony from these witnesses about what information they would have provided to trial counsel if they had been interviewed rendered Petitioner unable to demonstrate a claim of ineffective assistance of counsel on PCR. (Trial Ct. Op. Denying PCR, ECF No. 8-28 at 3.) The Appellate Division affirmed the PCR court's decision stating that Petitioner had failed to make out a prima facie case of ineffective assistance of counsel and that, "[i]n particular, defendant did not present affidavits from any of the witnesses attesting to the facts purportedly within their knowledge. In fact, with the exception of one individual, defendant did not even describe what information the witnesses

allegedly knew that would be helpful to the defense." (PCR App. Div. Op., ECF No. 8-33 at 3.)

A counsel's failure to investigate potential witnesses may form the basis of an ineffective assistance of counsel claim if a petitioner can demonstrate prejudice. See Strickland, 466 U.S. at 690-91; see also Brown v. United States, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). To successfully establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained … and whether such information, assuming admissibility in court, would have produced a different result." Id. (quoting United States v. Askew, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted). A petitioner may not merely speculate as to what a witness may have said. See Duncan v. Morton, 256 F.3d 189, 202 (3d Cir. 2001) (citing United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989)). Rather, a petitioner must present sworn testimony of that witness in order to establish that he suffered prejudice as a result of trial counsel's alleged failure to investigate that witness. See id.

Here, Petitioner has not provided any information, let alone sworn testimony, regarding what the witnesses would have testified about. Petitioner provides only mere speculation that certain individuals would have allegedly testified on his behalf. Absent

what testimony these witnesses would have provided and how that testimony would have affected the outcome of his trial, Petitioner is unable to present a <u>prima</u> <u>facie</u> claim that his counsel was ineffective for not interviewing these witnesses. Accordingly, Petitioner is not entitled to relief on this claim.

### c. Trial Counsel's Failure to Protect Petitioner from Double Jeopardy

Petitioner next asserts simply that his trial counsel was ineffective for failing to protect his right against Double Jeopardy. (Pet., ECF No. 1 at 6.) Respondents submit that defense counsel did protect Petitioner's rights against Double Jeopardy when she filed a motion to dismiss the indictment and bar a fourth trial. (Answer, ECF No. 8 at 14.) In that motion, defense counsel argued that that another retrial would be fundamentally unfair and would violate Petitioner's right against Double Jeopardy. (Petitioner's Br. in Support of Motion to Dismiss, ECF No. 8-5.) When the motion was denied by the trial court, defense counsel appealed to the Appellate Division, which ultimately affirmed the lower court's denial. (App. Div. Op. Affirming Denial of Motion to Dismiss, ECF No. 8-6.)

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be twice put in jeopardy" for the same offense. U.S. Const. amend. V. "It has long been settled, however, that the Double Jeopardy Clause's general prohibition

against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to a conviction." Lockhart v. Nelson, 488 U.S. 33, 38 (1988). Similarly, "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause." Richardson v. United States, 468 U.S. 314, 324 (1984). "[W]ithout exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial." Id. at 324 (quoting Arizona v. Washington, 434 U.S. 497, 509 (1978) (alteration in original). Underpinning these exceptions is the notion that while a defendant has the right to a fair trial, society also has an interest in punishing those who are criminally liable. See Lockhart, 488 U.S. at 38 ("It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.")

Here, Petitioner's right against Double Jeopardy was not implicated despite the fact that he was tried four times. Both Petitioner's first and third trials ended in a hung jury, and retrials following a hung jury do not implicate Double Jeopardy concerns. See Richardson, 468 U.S. at 324. Petitioner's second trial resulted in a conviction which was later reversed on direct

appeal for a trial court error. The Double Jeopardy Clause does not implicate retrials for a defendant who succeeds in setting aside his conviction on direct appeal because of an error in the trial court proceedings. <u>See</u> <u>Lockhart</u>, 488 U.S. at 38. Thus, Petitioner was never subjected to Double Jeopardy.

Further, Petitioner's argument that trial counsel failed to protect his rights against Double Jeopardy is not borne out by the record since trial counsel did file a motion raising that argument. Consequently, Petitioner cannot demonstrate that his trial counsel failed to protect his rights under the Due Process Clause because his attorney did, indeed, attempt to have Petitioner's case dismissed based upon double jeopardy grounds. Petitioner also cannot demonstrate that the outcome of the proceedings would have been different because trial counsel had argued that Petitioner's right against double jeopardy was being infringed upon because the trial court and Appellate Division had already denied trial counsel's motion. Accordingly, Petitioner is unable to demonstrate that trial counsel was ineffective. Petitioner is not entitled to relief on this claim.

### d.   Trial Counsel's Strategy

Petitioner next contends that his trial counsel failed to put forth a strategy for trial and that she stated "to the judge that

she has no strategy." (Pet., ECF No. 1 at 6.)[3] Respondents submit that Petitioner's claim is without foundation, as their review of the trial record did not disclose any mention by defense counsel that she lacked a trial strategy. (Answer, ECF No. 8 at 14.)

Strickland requires a presumption that counsel acted within the range of reasonable professional assistance. See Strickland, 466 U.S. at 689. The petitioner bears the burden of demonstrating that counsel's actions fell outside that wide range of reasonable assistance. See id. Moreover, "a convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. Thus, a petitioner attempting to assert an ineffective assistance of counsel claim must point to specific errors allegedly made by trial counsel. See United States v. Chronic, 466 U.S. 648, 666 (1984); see also Stevens v. Del. Corr. Ctr., 295 F.3d 361, 370 (3d Cir. 2002) ("[A] party claiming ineffective assistance must identify specific errors by counsel, and the court must indulge a strong presumption that counsel's conduct was reasonable.")

---

[3] It appears that this claim is unexhausted as it was not raised by Petitioner either on direct appeal or during his PCR proceedings. However, to the extent that a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). See Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007); Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005).

Here, Petitioner has submitted only the bare allegation that defense counsel failed to put forth any trial strategy. (Pet., ECF No. 1 at 6.) Although Petitioner alleges defense counsel informed the court that she "has no strategy," this allegation is not borne out by the trial record. Upon this Court's review of the trial transcripts from the fourth trial, it does not appear that defense counsel ever stated that she lacked a trial strategy. (See generally Trial Tr. dated 9/9/09, ECF No. 8-7; Trial Tr. dated 9/10/09, ECF No. 8-8; Trial Tr. dated 9/14/09, ECF No. 8-9; Trial Tr. dated 9/15/09, ECF No. 8-10; Trial Tr. dated 9/16/09, ECF No. 8-11.) In fact, the record demonstrates that trial counsel did have a strategy – to argue that her client had been wrongfully accused and to undermine the credibility of the victims to demonstrate that fact. (Answer, ECF No. 8, Ex. Ra6, ECF No. 8-7 at 52-59.) Trial counsel presented this argument during both her opening and closing statements, she cross-examined the victims with prior inconsistent statements, and she presented witnesses to undermine the credibility of the victims and their statements. (Trial Tr. dated 9/9/09, ECF No. 8-7 at 52-59 & 87-120; Trial Tr. dated 9/10/09, ECF No. 8-8 at 60-92; Trial Tr. dated 9/15/09, ECF No. 8-10; Trial Tr. dated 9/16/09, ECF No. 8-11 at 7-18.) Consequently, Petitioner has not established that defense counsel lacked a trial strategy. Petitioner has also not alleged how the outcome of his trial would have been different if defense counsel

had employed a different strategy. Petitioner is unable to overcome the strong presumption that counsel acted within the range of reasonable professional assistance. Therefore, he is not entitled to relief on this claim.

### e. Failure to Object to Sexually Explicit Photographs

Petitioner also contends that his trial counsel was ineffective for failing to object to the admission of sexually explicit photographs into evidence. (Pet., ECF No.1 at 6.) Petitioner states that although the photographs were deemed inadmissible at a pre-trial hearing, defense counsel failed to object to their introduction during his fourth trial. (Id.) Petitioner further states simply, "counsel condoned perjured testimony." (Id.) Respondents state that it is unclear which photographs Petitioner is referring to, but Respondents presume he is likely referring to photographs depicting oral sex between a man and a woman that Petitioner was alleged to have shown to one of the victims, S.E. (Answer, ECF No. 8 at 15.) Respondents admit that prior to the first trial, the court did rule certain sexually explicit photographs were inadmissible because the victim had been unable to identify that those were the photographs Petitioner had shown to her. (Id.) Given this ruling, those pictures were never presented at any of Petitioner's trials. (Id.) However, other sexually explicit photographs, which were discovered after the

trial court's ruling and which were identified by the victim as ones that Petitioner had shown to her, were introduced at Petitioner's fourth trial. (Id.) Respondents assert that these photographs were properly admitted during the fourth trial because they had not been subject to the trial court's prior ruling and there was no basis for trial counsel to object to their admission. (Id.)

Petitioner raised first this claim during his PCR proceedings. (Answer, ECF No. 8, Ex. Ra24, ECF No. 8-25 at 48.) In addressing a different, but related claim[4], the PCR court held:

> Finally, defendant argues that his attorney failed to cross-examine one of the minor victims on her failure to identify a photograph defendant allegedly showed her of his own private parts when later, at trial, she did so. However, the record shows that the photograph ultimately identified by the victim had not yet been discovered and was not among photos shown to her when she failed to make an identification. Subsequently, a photograph was recovered which the victim did testify at trial was the photo shown to her. Thus, there was no inconsistency in the witness' testimony that would have been an appropriate subject of cross examination.

(Answer, ECF No. 8, Ex. 27, ECF No. 8-28 at 4.)

The Appellate Division affirmed the PCR court's denial, stating Petitioner had made no more than "bald assertions"

---

[4] The PCR court did not address on the merits Petitioner's claim that counsel failed to object to the sexually explicit photographs.

regarding ineffective assistance of counsel. (Answer, ECF No. 8, Ex. Ra32, ECF No. 8-33 at 2-3.)

To demonstrate prejudice, a petitioner must show that "but for counsel's unprofessional errors," there is a "reasonable probability" that the outcome of the proceedings would have been different. See Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694-95. Here, Petitioner fails to acknowledge the fact that his trial counsel did object to the introduction of the sexually explicit photographs when they were first presented at his second trial. (Petitioner's Br. in Support of Motion to Dismiss, ECF No. 8-5 at 21.) Despite defense counsel's objection to the photographs, the trial court permitted the State to introduce them at trial. (Id.) Petitioner's trial counsel did not again object to their admission during the subsequent fourth trial. However, Petitioner cannot demonstrate that his trial counsel was ineffective for failing to object to the admission of the sexually explicit photographs, when trial counsel did object to their admission when they were first presented. Defense counsel was overruled when she objected and Petitioner cannot demonstrate that if counsel had objected again at the fourth trial, the trial court would have reversed its prior ruling. Petitioner is similarly unable to demonstrate that there is a reasonable probability that the outcome of the trial would have been different if defense

counsel had objected to the photographs' admission yet again at his fourth trial. Accordingly, Petitioner is not entitled to relief on this claim.

### 2. Prosecutorial Misconduct

In Ground Two, Petitioner raises several allegations of prosecutorial misconduct. (Pet., ECF No. 1 at 7.) Specifically, Petitioner states:

> 1. The prosecutor withheld evidence that Det. Oglesby was under indictment and in the very same courthouse during my trial.
>
> 2. The prosecutor contrived with the judge in secret to violate my right by denying me admissible evidence (Judge's order for me to be examined by their doctor for genital warts which I did not have).
>
> 3. Prosecutor knowingly violated my confrontational right(s) by reading Det. Oglesby's prior testimony to jury as Det. Oglesby was not unavailable but hidden by the State and court.
>
> 4. Prosecutor knowingly violated my right(s) by altering the video of S.E. preparing for her school dance to contrive a conviction.
>
> 5. Prosecutor knowingly violated my right(s) by allowing the alleged victim to use perjured testimony to help contrive a conviction.
>
> 6. Prosecutor knowingly violated my right(s) by allowing evidence (nude photos) which were obtained through a criminal act. The mother of alleg [sic] victim broke into my locked security box and took private nude photos along with my funds and other private items.

(Id.)

Under United States Supreme Court precedent, prosecutorial misconduct is insufficient to overturn a conviction unless it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). "It is not enough to show that a prosecutor's remarks were inappropriate or even deserving of universal condemnation." Reid v. Beard, 420 F. App'x 156, 159 (3d Cir. 2011) (citing Darden v. Wainwright, 477 U.S. 168, 181 (1986)). Rather, to determine whether prosecutorial misconduct has resulted in a denial of due process, reviewing courts must "examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001); see also Darden, 477 U.S. at 182; see also Donnelly, 416 U.S. at 643.

### a. Detective Oglesby

Petitioner submits that the prosecutor engaged in misconduct when she withheld evidence that Detective Oglesby was "under indictment and in the very same courthouse during my trial." (Pet., ECF No. 1 at 8.) Petitioner states that it was also misconduct for the prosecutor to permit Detective Oglesby's testimony to be read into the record when Detective Oglesby was being "hidden by the State and court." (Id.) Respondents argue that Petitioner offers no support for his bald assertions and he ignores the fact that it

was his own trial attorney who requested Detective Oglesby's testimony be read into the record. (Answer, ECF No. 8 at 16.) Although neither the PCR court nor the Appellate Division reached the merits of this issue, the claim was raised by Petitioner during his PCR proceedings. (Answer, ECF No. 8, Ex. Ra24, ECF No. 8-25 at 49.) The trial court's denial of Petitioner's PCR was ultimately affirmed by the Appellate Division. See R.J.C., 2017 WL 117297, at *1.

In order to protect a defendant's due process rights under the Fifth Amendment, the United States Supreme Court mandates that prosecutors must disclose all material exculpatory evidence to the defense. See Brady v. Maryland, 373 U.S. 83 (1963). If the prosecutor does not turn over "any favorable evidence known to the others acting on the government's behalf in the case, including the police," a criminal defendant may be entitled to a new trial. Giglio v. United States, 405 U.S. 150, 154 (1972). Evidence is deemed "material" if there is a reasonable probability that the absence of the evidence would "undermine confidence in the outcome of the trial." Strickland, 466 U.S. at 694 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Here, Petitioner has not demonstrated that the prosecutor engaged in misconduct. Petitioner has failed to demonstrate that the prosecutor knew Detective Oglesby was "under indictment and in the very same courthouse." Moreover, Detective Oglesby was a

defense witness and his testimony was favorable to Petitioner. Even if the prosecutor knew that Detective Oglesby was under indictment, this evidence would not have been favorable to Petitioner's case. In fact, this evidence would have, at best, discredited Petitioner's own witness and the beneficial testimony Petitioner sought to elicit from him. Petitioner has not shown that there is a reasonable probability that the absence of the evidence about Detective Oglesby's criminal charges, which could have only weakened Petitioner's defense, undermines the confidence in the outcome of the trial. Strickland, 466 U.S. at 694. Accordingly, Petitioner is not entitled to relief on this claim.

b. Evidence of Warts

Petitioner next states that "[t]he prosecutor contrived with the judge in secret to violate my right by denying me admissible evidence (judge's order for me to be examined by their doctor for genital warts which I did not have.)" (Pet., ECF No. 1 at 8.) Respondents contend this argument is both irrelevant and erroneous because this exclusion of evidence occurred at Petitioner's second trial, not at his fourth trial which is the subject of his instant § 2254 application. (Answer, ECF No. 8 at 16-17.) Petitioner raised this claim during his PCR proceedings, but it was not addressed on its merits by the PCR court or the Appellate Division. (Petitioner's pro se PCR Br., ECF No. 8-25 at 49.)

Habeas applications pursuant to 28 U.S.C. § 2254 are the appropriate remedy for petitioners "in custody pursuant to the judgment of a State court[.]" Here, however, Petitioner appears to be challenging a trial court ruling from his second trial which was later reversed by the Appellate Division. Prior to Petitioner's first trial, one of Petitioner's victims, S.E., was examined by a doctor who noticed signs of vaginal trauma and the presence of a venereal wart. (App. Div. Op., ECF No. 8-38 at 4.) Petitioner was also examined by a doctor, but he did not exhibit any visible venereal warts. (Id.) Prior to Petitioner's first trial, the State sought to introduce the testimony regarding the victim's vaginal trauma but requested that any testimony regarding the victim's venereal warts be excluded. (Id.) At a pre-trial hearing, the trial court ruled that any evidence regarding warts, or lack thereof, was not relevant to the case and was not admissible. (Id. at 4-6.) This evidence was, therefore, not elicited at his second trial. (Id. at 1-3.) Following his conviction at his second trial, Petitioner sought appeal of the trial court's evidentiary ruling. (Id.) The Appellate Division reversed the trial court's decision, stating that the exclusion of the venereal warts evidence resulted in a manifest denial of justice. (Id. at 6-7.) Petitioner's conviction was reversed and remanded for a new trial. (Id. at 7.) At Petitioner's fourth trial, the conviction from which he is presently appealing, the evidence regarding the presence of the

victim's venereal wart and Petitioner's lack of venereal warts was indeed elicited. (Trial Tr. dated 9/14/09, ECF No. 8-9 at 12.)

Here, Petitioner is challenging an evidentiary error from his second trial which resulted in a judgment of conviction that was reversed by the Appellate Division. Since that conviction was overturned, Petitioner is not currently in custody pursuant to that judgment. Rather, Petitioner is in custody, and is presently seeking relief from, the judgment of conviction that was obtained at his fourth trial. At his fourth trial, Petitioner was permitted to elicit testimony about venereal warts. Therefore, Petitioner's argument is moot. He is not entitled to relief on this claim.

c. Confrontation Clause

Petitioner next contends that the prosecutor violated his rights under the Confrontation Clause by allowing the testimony of Detective Oglesby to be read into the record at trial. (Pet., ECF No. 1 at 8.) Respondents assert that they were not responsible for Detective Oglesby's absence from trial and reiterate that it was Petitioner's trial attorney who requested Detective Oglesby's testimony be read in lieu of his live testimony. (Answer, ECF No. 8 at 16.) This claim was also raised by Petitioner during his PCR proceedings, but it was not addressed on its merits by either the PCR court or the Appellate Division.

The United States Supreme Court has held that the Confrontation Clause bars the admission of "testimonial statements

of witnesses absent from trial," unless that witness is unavailable to testify, and "the defendant has had a prior opportunity to cross-examine [that witness]." <u>Crawford v. Washington</u>, 541 U.S. 36, 59 (2004). When a party seeks to establish the unavailability of a witness, they must demonstrate that they made a good faith effort to locate the witness. <u>See</u> <u>Barber v. Page</u>, 390 U.S. 719, 724-25 (1968); <u>see also</u> <u>Zong Lor v. Jenkins</u>, 178 F. App'x 569, 570 (7th Cir. 2006).

Here, Petitioner has not demonstrated that his rights under the Confrontation Clause were violated. Petitioner's trial counsel informed the court of her good faith attempts to locate the witness, including the use of an investigator and her efforts to effectuate service on Detective Oglesby. Given Detective Oglesby's absence, defense counsel sought to introduce Detective Oglesby's testimony from a previous trial where both the State and the defense had the prior opportunity to cross-examine Detective Oglesby. These facts demonstrate that admission of Detective Oglesby's prior testimony was not a violation of Petitioner's rights under the Confrontation Clause. <u>See</u> <u>Crawford</u>, 541 U.S. at 59. Moreover, Petitioner has not demonstrated that the prosecutor's permission of Detective Oglesby's testimony rendered the trial so unfair as to make the resulting conviction a denial of due process. <u>See</u> <u>Donnelly</u>, 416 U.S. at 643. Detective Oglesby's testimony was favorable to the defense and was employed by the

defense to undermine the credibility of the victims. Accordingly, Petitioner has not demonstrated that the prosecutor engaged in misconduct. Petitioner is not entitled to relief on this claim.

### d. Admission of Photographs

Petitioner also alleges that the prosecutor erred when she admitted into evidence sexually explicit photographs that were "obtained through a criminal act." (Pet., ECF No. 1 at 8.) Petitioner adds that his wife, M.D., broke into his locked box and "took private nude photos along with my funds and other private items." (Id.) Respondents contend that Petitioner's claim is meritless because he fails to identify a criminal statute M.D. violated when she obtained the photographs from her own garage. (Answer, ECF No. 8 at 16.)

M.D. testified at trial that after Petitioner was arrested, he repeatedly asked her to search for a metal box that he said contained savings bonds. (Trial Tr. dated 9/10/09, ECF No. 8-8 at 112.) M.D. stated was unable to locate the box because it was not "in the place where [Petitioner] said it was." (Id.) Over one year after Petitioner was arrested, M.D. eventually discovered the box in her garage. (Id.) Upon opening the box, M.D. found "sexually explicit pictures" contained inside. (Id. at 113-14.) M.D. testified that she then turned the box over to the police. (Id.)

The Fourth Amendment protects individuals against unreasonable searches and seizures. See U.S. Const. amend IV.

Evidence obtained as a result of an unlawful search by the government is inadmissible at trial. See Wong Sun v. United States, 371 U.S. 471, 484 (1963) (citing Weeks v. United States, 232 U.S. 383 (1914)). This protection only extends, however, to unreasonable searches that are a result of governmental action. See Mapp v. Ohio, 367 U.S. 643, 660 (1961). Evidence that obtained by a private citizen, even wrongfully, is not barred from evidence at trial, so long as it was without participation by the government. See Burdeau v. McDowell, 256 U.S. 465, 475-76 (1921).

Here, there is no evidence that the State illegally obtained the metal box. M.D., a private citizen, discovered the box in her own home after having been asked repeatedly by Petitioner to locate it. There is no evidence that the government participated in M.D.'s discovery of the box or that the government ever urged M.D. to find it. Rather, M.D. stated it was at the request of Petitioner that she even attempted to locate it. Thus, Petitioner's argument that the prosecutor engaged in misconduct by proffering "illegally obtained photographs" is without merit because the photographs were not illegally obtained. Accordingly, Petitioner is not entitled to relief on this claim.

e.    Altered Video of Victim

In Petitioner's final two prosecutorial misconduct claims, he alleges that the prosecutor "violated my right(s) by altering the video of S.E. preparing for her school dance to contrive a

conviction" and that the prosecutor "violated my right(s) by allowing the alleged victim to use perjured testimony to help contrive a conviction." (Pet., ECF No. 1 at 8.) In his Petition, Petitioner drew a line connecting the two claims in what appears to be an indication that the claims are related. (Id.) Respondents submit that these arguments are without merit because Petitioner fails to specify how the video was altered or which witness allegedly committed perjury. (Answer, ECF No. 8 at 17.) Respondents presume Petitioner is attempting to raise the same argument he brought during his PCR proceedings where he alleged the prosecutor had deleted the portion of the video where the victim, S.E., allegedly spoke with her mother. (Id.) Respondents also presume that Petitioner is therefore arguing that S.E.'s testimony where she stated that she did not recall her mother being present when the video was filmed, was perjurious. (Id.)

A conviction obtained through the knowing use of false evidence, including false testimony, is fundamentally unfair and violates a defendant's due process rights. See Miller v. Pate, 386 U.S. 1, 7 (1967); see also Pyle v. Kansas, 317 U.S. 213 (1942). In order to demonstrate this constitutional violation, a petitioner must show that the evidence was false and that the prosecutor knew or should have known it was false. See Napue v. Illinois, 360 U.S. 264, 269 (1959); see also Prosdocimo v. Sec'y, Pennsylvania Dep't of Corr., 458 F. App'x 141, 146 (3d Cir. 2012); see also Lambert

v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004). Here, Petitioner has not demonstrated that any false evidence was admitted. Petitioner has not established that the video recording was altered, nor that any witness committed perjury. Petitioner provides only bald assertions about the video and witness testimony.[5] Accordingly, Petitioner has not demonstrated that the prosecutor violated his due process rights by knowingly using false evidence at trial. Petitioner is not entitled to relief on this claim.

### 3.  Judicial Misconduct

In Ground Three, Petitioner raises several claims of alleged "judicial misconduct." (Pet., ECF No. 1 at 9.) Specifically, Petitioner sets forth the following allegations in Ground Three:

> 1. Withheld evidence that Det. Oglesby was under indictment and in same courthouse during my trial.
>
> 2. On May 12, 2000, ordered me to be examined by their doctor. I complied and was negative for any disease. In April 2001 before trial, the judge in limine with the State denied that evidence and result.

---

[5] The Court of Appeals for the Third Circuit has previously held that "bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing on a habeas petition." Palmer v. Hendricks, 592 F.3d 386, 395 (3d Cir. 2010) (internal citation and quotation marks omitted). See also Simms v. Carroll, 432 F. Supp. 2d 443, 444 (D. Del. 2006) ("Bald assertions and conclusory allegations' do not provide a court with sufficient information to permit a proper assessment of habeas claims, and a habeas court cannot speculate about claims." (quoting 28 U.S.C. § 2254 Rule 2)).

3. Allowed State to read Det. Oglesby's prior testimony to jury without him being present or my consent.

4. Was disappointed that jurors couldn't convict me.

5. Allowed perjured testimony by State's witness.

6. Made negative comments to "ACPress" of proposed evidence by defense. Says I had agenda.

7. Allowed evidence which was once ruled inadmissible (nude pics) (of oral sex, female on male).

(Id.)

Respondents argue that Petitioner's assertions are mostly repetitive of claims he already raised in Grounds One and Two, and that any allegation of judicial misconduct is "unfounded, erroneous, and irrelevant, [. . .] as there is no evidence that [the judge] conducted himself improperly in this matter[.]" (Answer, ECF No. 8 at 18-20.)

At the outset, this Court notes that Petitioner's subpoints one, four, five, and six are bare allegations which do not afford a sufficient ground for an evidentiary hearing. See Palmer, 592 F.3d at 395. Petitioner provides no support for his contentions. There is nothing in the record that demonstrates the trial court "withheld evidence" regarding Detective Oglesby, or even that the trial judge was aware Detective Oglesby was facing criminal charges. Petitioner also provides no support for his allegation

that that the judge was apparently "disappointed" jurors did not convict Petitioner – presumably a reference to either Petitioner's first or third trial which each resulted in a hung jury. Further, Petitioner does not provide which State witness allegedly committed perjury. And, Petitioner fails to demonstrate that the trial judge ever made negative comments to the "ACPress." This Court cannot speculate as to what claims Petitioner may have intended to raise. See Simms, 432 F. Supp. 2d at 444. There is simply not sufficient information provided by Petitioner to permit a proper assessment of these claims. See id.

The remainder of Petitioner subpoints – subpoints two, three, and seven – all relate to questions of state evidentiary rules. (Pet., ECF No. 1 at 9.) Generally, the admissibility of evidence is a question of state law which is not cognizable on habeas review. See Estelle v. McGuire, 502 U.S. 32, 67-68 (1991); see also Keller v. Larkins, 251 F.3d 408, 416 N.2 (3d Cir. 2001) ("A federal habeas court … cannot decide whether the evidence in question was properly allowed under the state law of evidence.") "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983). If, however, a petitioner can demonstrate that the admission of the evidence denied him Due Process by depriving him of the "fundamental elements of fairness in [his] criminal trial," then

his claim may be cognizable on habeas review. Glenn v. Wynder, 743 F.3d 402, 407 (3d Cir. 2014) (quoting Riggins v. Nevada, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). A petitioner's trial "need not have been perfect," but it must have been fair. United States v. Hastin, 461 U.S. 499, 508 (1983). Thus, a petitioner can only succeed in challenging a state court's evidentiary ruling by showing that the ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." Scott v. Bartkowski, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994)). The category of infractions that violate fundamental fairness has been defined by the Supreme Court "very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited application." Medina v. California, 505 U.S. 437, 443 (1992).

In Petitioner's subpoint two he argues that the trial court erred in excluding evidence that he did not exhibit visible manifestation of venereal warts caused by human papillomavirus (HPV). (Pet., ECF No. 1 at 9.) As discussed previously, this evidentiary ruling related only to Petitioner's first and second trials. After Petitioner was convicted following his second trial, he appealed the trial court's evidentiary ruling and the Appellate Division reversed his conviction, stating that he should have been permitted to introduce the evidence of venereal warts. Thus, at

Petitioner's fourth trial, the conviction from which he seeks relief, he was allowed to introduce this evidence. Thus, Petitioner's claim attempts to challenge his conviction from his second trial, which was reversed, and not the conviction from which he is presently confined. See 28 U.S.C. § 2254 (stating that a writ of habeas corpus is a civil action for "a person in custody pursuant to the judgment of a State court[.]") Accordingly, Petitioner is not entitled to relief on this claim.

In Petitioner's subpoint three, he alleges that the trial court also erred in permitting Detective Oglesby's prior testimony to be read to the jury. (Pet., ECF No. 1 at 9.) As discussed previously, Detective Oglesby was a witness for the defense. His testimony was used by Petitioner to undermine the credibility of the victim-witnesses at trial. Moreover, it was defense counsel's request that the testimony be read into the record given the unavailability of Detective Oglesby. Accordingly, Petitioner is unable to demonstrate that the admission of Detective Oglesby's testimony, which was favorable to Petitioner, was so prejudicial as to render his trial fundamentally unfair. See Scott, 2013 WL 4537651, at *9. Petitioner is not entitled to relief on this claim.

Finally, in Petitioner's subpoint seven, he states that the trial court erred by allowing the admission of sexually explicit photographs into evidence that the trial court had previously ruled were inadmissible. (Pet., ECF No. 1 at 9.) This claim, however,

misstates the procedural history of the case. Prior to Petitioner's first trial, the court ruled that several sexually explicit photographs were inadmissible because the victim had been unable to identify them. (Trial Ct. Op. Denying PCR, ECF No. 8-28 at 4.) The photographs that were introduced at Petitioner's fourth trial, however, were not the same photographs that had been subject to the trial court's initial ruling. (Id.) The photographs presented at Petitioner's fourth trial had not been discovered until after the first trial had concluded, and the victim was able to identify those photographs as the ones Petitioner had shown to her. (Id.) Accordingly, Petitioner is not entitled to relief on this claim.

IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

V.    CONCLUSION

In the accompanying Order filed herewith, the Petition for habeas relief under 28 U.S.C. § 2254 is denied.


Dated: July 18, 2019

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**
